UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 4:17-cr-532 HEA |
| | ) |
| TALEB JAWHER, | ) |
| | ) |
| Defendant. | ) |

## SENTENCING MEMORANDUM

COMES NOW Defendant, Taleb Jawher, by and through counsel, and files the following memorandum for sentencing.

### I. Background

On November 15, 2017, the government filed a one-count indictment, alleging Jawher violated Title 18 U.S.C. § 922(g)(5).  *See* Indictment [Doc. Text #1].  On May 7, 2018, Jawher pled guilty to the indictment.  *See* Doc. Text #52.  At the time of his plea, the parties agreed to a USSG § 2K2.1(c)(1)(B) cross reference but did not agree which Chapter Two, Part A, Subpart I, guideline should apply.  *See Presentence Investigation Report* ¶ 3 [hereinafter PSR].  The PSR applies USSG § 2A1.2, the second-degree murder guideline.  *See* PSR at ¶ 30; *see also* Addendum to Presentence Report at 2-3.  Jawher objects to the PSR and claims USSG § 2A1.4 applies, the guideline for involuntary manslaughter.  In support of this claim, Jawher makes two related points.  First, under Eighth Circuit precedent, he did not commit a federal homicide, as the Addendum to the Presentence Report suggests.  *See* Addendum to Presentence Report at 2-3.  He committed a Missouri State homicide.  Second, Missouri involuntary manslaughter much more closely resembles Jawher's offense than does Missouri second-degree murder.  Jawher also

1

makes one concession:  USSG § 2K2.1(b)(6)(B) applies and adds four levels to his base offense level of 14.  That said, Jawher submits a five-year sentence is appropriate under all the circumstances of the case, a sentence more than double the high-end of the 18 to 24-month involuntary manslaughter guideline range and a sentence consistent with an offense level (25) at the midpoint between the involuntary manslaughter (15) and second-degree murder guideline offense levels (35).

## II. USSG § 2K2.1(b)(6)(B)

**Jawher Concedes he Committed the Missouri Offense of Exhibiting.  USSG § 2K2.1(b)(6)(B) thus Applies and Adds Four Levels to his Base Offense Level of 14.**

The PSR adds four levels to Jawher's base offense level because Jawher possessed a firearm in connection with "another felony offense," exhibiting or second-degree assault.  *See* PSR at ¶ 29.  Jawher has not been convicted of either offense, though, s*ee* PSR at ¶¶ at 41-46, and, in the absence of a conviction, "the government must prove by a preponderance of the evidence all of the essential elements of the underlying felony offense, including the absence of any defenses."  *United States v. Betts*, 509 F.2d 441, 445 (8th Cir. 2007) (citation omitted).

Read together, four Missouri statutes provide an "absolute defense" to anyone who uses *physical force* against another person by exhibiting[1].  But the Missouri Supreme Court classifies exhibiting a firearm in an angry or threatening manner as the use of "*deadly force*."  *State v.*

---

[1] RSMo 571.030.5 exempts from exhibiting liability "any person who engages in a lawful act of defense pursuant to section 563.031."  Section 563.031(1)(c) authorizes any person to use physical force against another, *see* RSMo 563.031(3), provided he is justified in so doing under some chapter 563 provision.  Section 563.041.1 authorizes any person to "use physical force upon another person when and to the extent that he…reasonably believes it necessary to prevent what he…reasonably believes to be the commission…of a stealing…in any degree."  Section 563.074, in turn, provides "an absolute defense to criminal liability" to any "person who uses force as described section… 563.041…"

*Cummings*, 514 S.W.3d 110, n. 8 (Mo, App. W.D. 2017) (emphasis added) (citing *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc. 1992). Jawher cannot claim the lawful use of deadly force, given the facts of the offense, and, consequently, cannot claim the defense the text of Missouri's statutes otherwise provide. Jawher thus withdraws his objection to paragraph 29 of the PSR and submits the four levels added under § 2K2.1(b)(6)(B) apply and increase his base offense level from 14 to 18[2].

### III. The USSG § 2K2.1(c)(1)(B) Cross Reference

### A. Rules

In relevant part, USSG § 2K2.1(c)(1) provides,

> If the defendant used or possessed any firearm cited in the offense of conviction in connection with the commission of another offense…, apply…
>
> if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart I (Homicide), if the resulting offense level is greater than that determined above.

USSG § 2K2.1(c)(1), (c)(1)(B).

To determine which Chapter Two, Part A, Subpart I guideline to apply, a court may rely on the facts of the offense and common sense. *See United States v. Walls*, 80 F.3d 238, 242 (7th Cir. 1996) (citations omitted); *see also United States v. Harris*, 552 Fed.Appx. 432, 439 n. 2 (6th Cir. 2014). To accommodate to the facts, a court may apply a guideline, even if the guideline's text does not strictly fit the offense facts. *See United States v. Fortier*, 180 F.3d 1217, 1228, 1229 (10th Cir. 1999) (directing the district court to apply the involuntary manslaughter guideline to a defendant convicted of multiple felonies, though the involuntary manslaughter

---

[2] Because Jawher exhibited a firearm, he does not address whether he committed a Missouri second-degree assault. He does not, however, concede the point. The Missouri second-degree assault statute contains four separate subsections. *See* RSMo 565.052. The PSR suggests Jawher violated subsection (2) or (4), *see* Addendum to the Presentence Report at 1-2, and Jawher may have a defense to a violation of one or both of these subsections.

3

guideline technically applies only when death results from the commission of a misdemeanor or lawful conduct).

Likewise, a court may "split the difference" and select an offense level between two guidelines that might otherwise apply. *See Walls*, 80 F.3d at 240-242 (7th Cir. 1996) (upholding district court's selection of an offense level of 29, before acceptance of responsibility and 27 after, because the district court concluded the defendant's conduct "fell somewhere between voluntary manslaughter and second-degree murder."). In short, a district court has discretion to select the most analogous offense guideline and fix an offense level appropriate to the facts.

### B. Under Eighth Circuit Precedent, Jawher did not Commit a Federal Homicide Offense.

As with USSG § 2K2.1(b)(6)(B), for purposes of subsection (c)(1)(B), in the absence of a conviction for the alleged "[]other offense," the government must prove by a preponderance of the evidence all of the elements of the underlying offense, including the absence of any defenses. *United States v. Howe*, 538 F.3d 842, 854-855 (8th Cir. 2008) (abrogated on other grounds) (citation omitted). This rule excludes any 18 U.S.C. §§ 1111 or 1112 homicide from serving as the "[]other offense" under subsection (c)(1)(B) because both statutes include as an element of their offenses that the homicide occur "[w]ithin the special maritime and territorial jurisdiction of the United States.[3]" 18 U.S.C. §§ 1111(b), 1112(b); *see also* Eighth Circuit Model Instructions 6.18.1111A, 6.18.1111B, 6.18.1112A, 6.18.1112B.

---

[3] *See e.g., United States v. Thomas*, 280 F.3d 1149, 1156 (7th Cir. 2002) (recognizing the federal homicide statutes include as an element of the offense that the homicide occur within the special maritime or territorial jurisdiction of the United States and reserving for "future litigation" whether the definitions contained in those statutes apply in the context of § 2K2.1(c)(1), when the homicide did not occur within that jurisdiction).

4

Title 18 U.S.C. § 7 defines the phrase "within the special maritime and territorial jurisdiction of the United States" and excludes state property from its definition. *See* 18 U.S.C. § 7; *see also* Eighth Circuit Model Criminal Instructions, 6.18.1111, Introductory Comments To Homicide Instructions, Committee Comments, Federal Jurisdiction Under 18 U.S.C. § 7[4]. Jawher committed the instant offense on state property:  the Phillips 66 gas station at 2800 N. Florissant Avenue in St. Louis, Missouri.  Thus, no federal homicide can serve as the "[]other offense" under subsection (c)(1)(B) because the government cannot prove by a preponderance of the evidence at least one essential element of every federal homicide offense:  that the offense occurred "within the special maritime or territorial jurisdiction of the United States."

### C. Jawher's Offense More Closely Resembles Missouri Involuntary Manslaughter than it Resembles Missouri Second-Degree Murder.

Missouri law codifies two forms of second-degree murder, conventional murder and felony murder, and defines the former as a "knowingly" caused death.  *See* RSMo 565.021.1(1).

---

[4] "The phrase 'within the exclusive jurisdiction of the United States' applies to crimes committed within the premises, grounds, forts, arsenals, navy-yards, and other places within the boundaries of a state or within a territory over which the federal government has jurisdiction.  *In re Gon-shay-ee*, 130 U.S. 343, 351 (1889).  Currently, 18 U.S.C. § 7 describes those same places more expansively and affixes to them the phrase 'special maritime and territorial jurisdiction of the United States.'  The statute defines this as including, among other things, the high seas, any other waters within the admiralty and maritime jurisdiction of the United States and *without jurisdiction of any particular state*, any American vessel on the waters of any of the Great Lakes or on any of the waters connecting the Great Lakes, and any American aircraft while in flight over the high seas, or over any other waters within the admiralty and maritime jurisdiction of the United States.  Although not enumerated in section 7, federal jurisdiction extends to crimes committed in Indian country under 18 U.S.C. § 1152, and exclusive federal jurisdiction is granted over certain enumerated offenses, including murder and manslaughter, committed by an Indian within Indian country (18 U.S.C. § 1153).

Federal jurisdiction under 18 U.S.C. §§ 1111 and 1112 ultimately depends on the location of the offense.  The location is determined by where the injury was inflicted or other means employed which caused the death, without regard to where the death actually occurred. 18 U.S.C. § 3236; *United States v. Parker*, 622 F.2d 298, 302 (8th Cir. 1980).  If injuries are inflicted both outside and inside the federal boundary, the Eighth Circuit adopts a proximate cause analysis and requires the government to prove beyond a reasonable doubt that the victim died as a proximate result of the injuries inflicted within the federal boundary.  Id." (emphasis added)

Under Missouri law, "[a] person acts knowingly…with respect to a result of his…conduct when he…is aware that his…conduct is practically certain to cause that result." RSMo 562.016.3(2).

Missouri defines felony murder as a death caused during the course of any felony offense. *See* RSMo 565.021.1(2). But the Missouri Supreme Court limits the felony murder rule's use through the "merger doctrine." *See State v. Shock*, 68 Mo. 552, 561-563 (Mo. banc. 1878). Under this doctrine, "acts of personal violence…which are necessary and constituent elements of the homicide itself" merge with the homicide and prohibit the felony murder rule's use. *See State v. Shock*, 68 Mo. 552, 561-563 (Mo. banc. 1878). Missouri courts have applied this doctrine in both the assault and exhibiting contexts. *See id.* (applying the doctrine to the underlying felony of assault); *see also State v. Hanes*, 729 S.W.2d. 612, 617 (Mo. App. E.D 1987) (applying the doctrine to the underlying felony of assault) (citing W. LaFave & A. Scott, Handbook on Criminal Law, § 71, at 559 n. 73 (1972)); *State v. Cook*, 560 S.W.2d 299, 303-304 (Mo. App. W.D. 1978) (applying the doctrine to the underlying felony of exhibiting) (abrogation recognized by *State v. Dudley,* S.W. 3d. 203, 207 (Mo. App. W.D. 2010)).[5] As a result, second-degree felony murder cannot form the basis of a § 2A1.2 cross reference.

Missouri law codifies only one form of involuntary manslaughter and categorizes it as a class C felony. *See* RSMo 565.024.1. Under Missouri law, "[a] person commits the offense of

---

[5] Whether or not the Missouri Supreme Court will continue to apply the merger doctrine remains an open question. *See e.g.*, Jared Guemmer, *The Missouri Felony Murder Rule's Merger Limitation: A Doctrine in Limbo*, 80 Mo. L. Rev. 1165 (2015) (arguing the merger doctrine should continue to apply, despite changes to the state's felony murder statute since the supreme court decided *Shock*.). The Western and Southern Appellate Divisions have held the doctrine should no longer apply. See id. The Eastern Division has not yet decided the issue. *See id*. Either way, the state supreme court's last and apparently only opinion on the matter applied the doctrine and, at least for the moment, its validity continues. *See State v. Shock*, 68 Mo. 552 (Mo. banc. 1878). And, for this Court's purposes, it's the state supreme court that counts. *See United States v. Dixon*, 822 F.3d 464, 466 (8th Cir. 2016) (applying Missouri Supreme Court law to determine whether a non-functional firearm qualifies as "readily capable of lethal use" under RSMo 571.030.1) (citing *United States v. Litrell*, 557 F.3d 616, 617-18 (8th Cir. 2009) ("looking to state supreme court decisions to determine whether defendant had committed a 'felony offense' under USSG 2K2.1(b)(6)(B)").

involuntary manslaughter…if he or she recklessly causes the death of another person" *Id*. "A person 'acts recklessly' or is reckless when he or she consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." RSMo 565.016.4.

Jawher thus committed either conventional second-degree murder or involuntary manslaughter and which he committed turns on whether he knowingly or recklessly "cause[d] the death of another person" – that is, whether he was "aware that his…conduct was practically certain to cause death" or whether "he consciously disregarded a substantial and unjustifiable risk" that death might result. Jawher claims the second of these two mental states better fits the facts. More importantly, the cases below support his claim, illustrate the difference between reckless and knowing conduct in the context of Missouri firearm homicides, and demonstrate that the involuntary manslaughter guideline is the most analogous guideline to apply for purposes of the subsection (c)(1)(B) cross reference.

Seven Missouri cases are discussed below. Of these seven, three involve convictions for involuntary manslaughter. The remaining four involve convictions for second-degree murder. In all seven, the victim was shot and killed. Plausibly or otherwise, each defendant in the first three cases claimed the homicide resulted from an accidental discharge or the reasonable use of deadly force. In the latter four cases, the defendants purposefully directed a firearm at or towards another person and consciously pulled the trigger. The facts of the instant case resemble the facts of the first three cases. *See Plea Agreement* at 3. They do not resemble the facts of latter four at all.

7

In *State v. Hayes,* 88 S.W.3d 47 (Mo. app. W.D. 2002), Hayes and his neighbor had an ongoing dispute that came to a head when Hayes drove his truck at his neighbor. *See id*. at 54. Hayes stopped, got out of the truck, and the two exchanged words. *See id.* The neighbor slapped Hayes, who, in response, pulled out a gun and fired. *See id.* Thirteen days later, the neighbor died from a gunshot wound to the neck. *See id.* At trial, Hayes claimed self-defense. *See id*. at 57-59. His jury, however, discounted his claim, and Hayes' was sentenced to consecutive two- and four-year sentences for involuntary manslaughter and armed criminal action, respectively. *See id*. at 53-54.

*State v. Miller*, 772 S.W.2d 782 (Mo. App. S.D. 1989) (overruled on unrelated grounds), involved a quarrel at a tavern between Miller and another patron, the former roommate of Miller's date. *See id*. at 783. After the quarrel, Miller went outside and grabbed a rifle from his car. *See id*. His date's former roommate followed, and, according to Miller, the rifle went off when Miller's date grabbed it. *See id.* According to the former roommate, no one grabbed the rifle at all. *See id.* Miller just aimed it at him and fired. *See id*. Either way, the bullet struck a bystander who died at the scene. *See id*. Miller received a five-year sentence for involuntary manslaughter. *See id.* at 783-784.

In *State v. Jennings*, 887 S.W.2d 752 (Mo. App. W.D. 1994), Jennings awoke after two cars raced down his street. *See id*. at 753. Jennings walked outside, got into his car, and drove after them. *See id*. Several blocks away, he found his son in one of the cars. *See id*. He told his son to go home and pulled up to the other car. *See id*. Jennings got out, drew the hammer on a gun, and approached the driver's side window. *See id*. There, he aimed the gun at the driver and told him to leave. *See id*. According to Jennings, the gun then discharged and the bullet struck the driver in the head. *See id*. Jennings was sentenced to concurrent four- and seven-year

8

sentences for involuntary manslaughter and armed criminal action, respectively. *See id*. at 752-753.

In *State v. Rogers*, 976 S.W.2d 529 (Mo. App. S.D. 2000), Rogers drove to a bar and, in a crowd across the street, noticed his wife from whom he had separated about 30 days earlier. *See id*. at 530. Rogers stepped out of his car, exchanged words with someone in the crowd, and went into the bar. *See id*. About 30 minutes later, he walked out, exchanged several more words with someone in the crowd, and told his wife to get out of the area. *See id*. His wife asked him not to start trouble. *See id.* at 530-531. In response, Rogers walked to his car, grabbed a gun from inside, and fired it in the air. *See id*. at 531. He then aimed it at his wife, lowered it, and fired it towards the ground near where she stood. *See id*. The bullet struck her and she died at the scene. *See id*. Rogers was sentenced to a 20-year term of imprisonment for second-degree murder. *See id*. at 530.

*State v. Cook*, 560 S.W.2d 299 (Mo. App. W.D. 1977) (abrogated on unrelated grounds), involved a dispute between two CB radio enthusiasts. *See id*. at 301. The dispute devolved into a car chase, during which Cook pulled alongside his antagonist's car, lifted a gun out the window, and aimed it at the passenger. *See id*. According to Cook, the gun fired when Cook's passenger struck Cook's arm - a claim Cook's passenger denied. *See id*. *See id*. Cook fled the scene but was apprehended shortly after. See id. Cook received a 15-year sentence for second-degree murder. *See id*. at 301.

*State v. Gheen*, 41 S.W.3d 598 (Mo. App. W.D. 2001), involved an argument between motorists, each of whom accused the other of reckless driving. *See id*. at 600-601. They pulled their cars to a stop on the side of the road about 100 yards apart. *See id*. at 601. Gheen grabbed a gun and shot three times towards the motorist. *See id*. One of the bullets ricocheted off the

9

ground and struck the motorist, who died the next day. *See id*. Gheen left the scene, dissembled the firearm, and threw the parts in a river. *See id*. Following a trial, Gheen was sentenced to concurrent 5 and 15-year sentences for armed criminal action and second-degree murder, respectively. *See id.* at. 600.

In *State ex rel Green*, 131 S.W.3d 803 (Mo. banc. 2004), Green and his fiancée argued after Green's fiancée accused him of infidelity. *See id.* at 804. Green grabbed a shotgun, threatened to commit suicide, and fired a shot in the air. *See id*. He reloaded, aimed the shotgun at his fiancée, and fired. *See id*. Green pled guilty and received consecutive 10–year sentences for second-degree murder and armed criminal action, *see id*. at 804, the latter of which was vacated post-conviction. *See id*. at 810.

One obvious fact distinguishes the first three cases from the latter four and demonstrates the difference between reckless and knowing conduct in the context of Missouri firearm homicides. In *Hayes*, *Miller*, and *Jennings*, the defendants accidentally discharged a firearm, or at least a jury so found. In *Rogers, Cook, Green*, and *Gheen*, the defendants purposefully aimed a firearm at or in the direction of another person and consciously pulled the trigger. The first three defendants acted recklessly; the latter four acted knowingly.

Here, the parties agree Jawher inadvertently discharged a firearm as he and Simmons fought on the Phillips 66 lot. *See* Plea Agreement at 3. Like the defendants in *Hayes, Miller*, and *Jennings*, Jawher acted recklessly and committed involuntary manslaughter. As a result, the involuntary manslaughter guideline is the most analogous guideline to apply for purposes of the subsection (c)(1)(B) cross reference.

### IV. Conclusion

Jawher is a 40 year-old married male whose only prior conviction stems from a ticket for operating a motor vehicle without insurance. For seven-plus years, he's worked between 50 and 80 hours a week at one of two gas stations in the St. Louis area without any incident whatsoever - save his past on-duty effort to disrupt a kidnapping which led to several shots fired in his direction. He has no meaningful history of substance abuse and no history of mental health issues. He does, however, have a glass eye, the result of two prior serious assaults from just over 20 years ago and the inadequate medical care he received for his injuries.

In the instant case, Jawher did not commit his § 922(g)(5) offense in connection with the commission of "another offense" within the special maritime or territorial jurisdiction of the United States. As a result, he did not commit a federal homicide offense for purposes of the subsection (c)(1)(B) cross reference. He committed a Missouri homicide offense, and between Missouri second-degree murder and involuntary manslaughter, his offense conduct only resembles the latter. USSG § 2A1.4 thus applies, and Jawher's advisory guideline range is 18 to 24 months.

Despite this range, Jawher submits a 60-month sentence is reasonable under the circumstances of the case and given the four to seven year sentences imposed in the involuntary manslaughter cases discussed. A 60-month sentence also fits with the subsection (c)(1)(B) cross-reference framework. The PSR applies a § 2A1.2 cross reference and a total offense level of 35. A total offense level of 35 represents a 20-level increase over § 2A1.4's total offense level of 15. The mid-point between the two is a total offense level of 25, which, for criminal history category I offenders like Jawher, yields an advisory guideline range of 57 to 71-months. Thus, a 60-

month sentence represents an outcome slightly above the mid-point of a "split the difference" sentence of the kind approved in *Walls*, 80 F.3d at 242 (7th Cir. 1996).

WHEREFORE, Defendant submits this Court should apply a USSG § 2A1.4 cross reference and impose a 60-month term of imprisonment.

                              Respectfully Submitted

By:    /s/ Adam D. Fein_____
        ADAM D. FEIN, #52255 MO
        Attorney for Defendant
        120 S. Central Avenue, Suite 130
        Clayton, Missouri 63105
        (314) 862-4332/Facsimile (314) 862-8050
        Email: afein@rsflawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2019, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ms. John J. Ware, Assistant United States Attorney.